Trenton R. Kashima, Esq. (SBN 291405)
tkashima@sommerspc.com
SOMMERS SCHWARTZ, P.C.
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone: (619) 762-2125
Facsimile: (619) 762-2127

Jason J. Thompson, Esq. (*Pro Hac Vice*)
jthompson@sommerspc.com
SOMMERS SCHWARTZ, PC
One Town Square, Suite 1700
Southfield, MI 48076
Telephone: 248-355-0300
Facsimile: 248-746-4001

THE TIDRICK LAW FIRM LLP
STEVEN G. TIDRICK, SBN 224760
Joel B. Young, SBN 236662
1300 Clay Street, Suite 600
Oakland, California 94612
Telephone: (510) 788-5100
Facsimile: (510) 291-3226
E-mail:sgt@tidricklaw.com
E-mail:jby@tidricklaw.com

*Attorneys for Plaintiffs*
*and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANE ROE, et al.** individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>**v.**<br><br>**DÉJÀ VU SERVICES, INC., et al.,** jointly and severally,<br><br>    Defendants. | Case No: 14-cv-03616-LB<br><br>Related Cases:<br>   16-cv-03371-LB<br>   17-cv-00138-LB<br>   17-cv-05288-LB<br>   17-cv-06971-LB<br>   19-cv-03960-LB<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND LEAVE TO FILE AMENDED COMPLAINT**<br><br>The Honorable Laurel Beeler<br><br>Date: March 17, 2022<br>Time: 9:30 a.m. |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on March 17, 2022 at 9:30 a.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, in **Courtroom B – 15th Floor**, before the Hon. Laurel Beeler, Plaintiffs will and hereby do move the Court for leave to leave to file the proposed First Amended Complaint; conditional class certification; appointment of Jane Roes 1-2 as class representatives, appointment of the undersigned counsel as class counsel, preliminary approval of class action settlement; approval of class notice; and a date for the final approval hearing.

As further explained in the concurrently filed Memorandum of Points and Authorities, the motion is made on the grounds that proposed class settlement is fair and reasonable, and should be preliminarily approved.

The motion is based on this Notice, Memorandum of Points and Authorities, the Declarations of Joel B. Young, Jason T. Thompson, and the Doe Plaintiffs, supporting exhibits, the oral argument of the parties if requested by the Court, and the complete files and records of this action.

Respectfully submitted,:

Date: February 11, 2022                    SOMMERS SCHWARTZ P.C.


By:  /s/ Trenton Kashima
Trenton R. Kashima, Esq.
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone:  (619) 762-2125
Facsimile:   (619) 762-2127

*Attorneys for Plaintiff and the*
*Proposed Class*

1

Trenton R. Kashima, Esq. (SBN 291405)
tkashima@sommerspc.com
SOMMERS SCHWARTZ, P.C.
402 West Broadway, Suite 1760
San Diego, CA 92101
Telephone:  (619) 762-2125
Facsimile:   (619) 762-2127

Jason J. Thompson, Esq. (*Pro Hac Vice*)
jthompson@sommerspc.com
SOMMERS SCHWARTZ, PC
One Town Square, Suite 1700
Southfield, MI 48076
Telephone:  (248) 355-0300
Facsimile:  (248) 746-4001

THE TIDRICK LAW FIRM LLP
Steven G. Tidrick, SBN 224760
Joel B. Young, SBN 236662
1300 Clay Street, Suite 600
Oakland, California  94612
Telephone:  (510) 788-5100
Facsimile:   (510) 291-3226
E-mail:sgt@tidricklaw.com
E-mail:jby@tidricklaw.com

*Attorneys for Plaintiffs*
*and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANE ROE, et al.** individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>**v.**<br><br>**DÉJÀ VU SERVICES, INC., et al.,** jointly and severally,<br><br>      Defendants. | Case No:  14-cv-03616-LB<br><br>Related Cases:<br>   16-cv-03371-LB<br>   17-cv-00138-LB<br>   17-cv-05288-LB<br>   17-cv-06971-LB<br>   19-cv-03960-LB<br><br>**PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND LEAVE TO FILE AMENDED COMPLAINT**<br><br>The Honorable Laurel Beeler<br><br>Date:  March 17, 2022<br>Time: 9:30 a.m. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES .............................................................................................. iii

I.      INTRODUCTION ................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 2

        A.      The San Francisco Action .......................................................................... 2

        B.      The Michigan Action .................................................................................. 3

        C.      The San Diego Action ................................................................................ 4

        D.      The Appellate Courts Rule in the Michigan and San Francisco Actions. ..................... 7

        E.      Efforts to Settle the San Francisco and San Diego Actions ........................... 8

III.    THE TERMS OF THE SETTLEMENT AGREEMENT ........................................ 9

        A.      Consolidation and Amendment of the Complaints ........................................ 9

        B.      The Settlement Classes .............................................................................. 9

        C.      The Benefit to the Class ........................................................................... 10

        D.      Release of Claims ..................................................................................... 13

        E.      Class Notice .............................................................................................. 13

IV.     LEAVE TO FILE THE AMENDED COMPLAINTS FOR SETTLEMENT SHOULD BE GRANTED TO ALLOW A GLOBAL SETTLEMENT ........................................ 14

V.      THE ACTIONS SHOULD BE PRELIMINARILY CONSOLIDATED ............... 15

VI.     THE PROPOSED SETTLEMENT CLASS MEETS ALL THE REQUIREMENTS OF CLASS CERTIFICATION ................................................................................... 15

        A.      Numerosity ................................................................................................ 16

        B.      Predominance and Commonality ............................................................... 16

        C.      Typicality .................................................................................................. 17

        D.      Adequacy ................................................................................................... 17

        E.      Superiority ................................................................................................. 18

VII.    THE COURT SHOULD PRELIMINARILY APPROVE THIS SETTLEMENT ... 19

        A.      The Proposed Settlement Meets the Standards for Preliminary Approval ................. 19

                1.      The Settlement was reached after Contentious and Informed Arms' Length Negotiations ......................................................... 19

2. The Proposed Settlement Falls Within the Range of Possible Approval.........20

3. The Settlement Provides an Effective Method of Distributing Relief to the Class ....................................................................................................................30

VIII. THE SETTLEMENT ALSO WARRANTS APPROVAL UNDER THE FLSA...................31

IX. THE PROPOSED NOTICE WILL ADEQUATELY APPRISE THE CLASS OF THEIR RIGHTS UNDER THE SETTLEMENT.............................................................................32

X. CONCLUSION..........................................................................................................33

# TABLE OF AUTHORITIES

**Federal Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
No. 15-CV-6314, 2017 WL 1806583 (N.D. Cal. May 5, 2017) ................................... 18

*Accurate Credit Transactions Act (FACTA) Litig.*,
295 F.R.D. 438 (C.D. Cal. 2014) ............................................................... 23, 29

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................. 18

*Barrentine v. Arkansas–Best Freight System, Inc.*,
450 U.S. 728 (1981) ................................................................................. 32

*Beck-Ellman v. Kaz USA, Inc.*,
2013 WL 1748729 ................................................................................... 20

*Boyd v. Bechtel Corp.*,
(N.D. Cal. 1979) 485 F.Supp. 610 ................................................................ 31

*Brooklyn Sav. Bank v. O'Neil*,
324 U.S. 697 (1945) ................................................................................. 32

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ...................................................................... 20

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ....................................................................... 24

*Collins v. Sanderson Farms, Inc.*,
568 F. Supp. 2d 714 (E.D. La. 2008) ............................................................. 33

*Cotter v. Lyft, Inc.*,
193 F. Supp. 3d 1030 (N.D. Cal. 2016) .......................................................... 20

*Cotton v. Hinton*,
(5th Cir. 1977) 559 F.2d 1326 .................................................................... 31

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990) ..................................................................... 29

*Crawford v. Lexington–Fayette Urban County Gov't*,
No. 06-299, 2008 WL 4724499 (E.D. Ky. Oct. 23, 2008) .................................... 33

*Doe 1-2 v. Deja Vu Servs., Inc.*,
No. 2:16-CV-10877, 2017 WL 2629101 (E.D. Mich. June 19, 2017) ......................... 4

*Devlin v. Transp. Commc'ns Int'l Union*,
175 F.3d 121 (2d Cir.1999) ....................................................................... 16

*Does 1-2 v. Deja Vu Servs., Inc.*,
   925 F.3d 886 (6th Cir. 2019) ................................................................. 8

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................... 17, 18, 19

*Hanon*,
   976 F.2d ..................................................................................... 19

*Harris v. Vector Marketing Corp.*,
   (N.D. Cal. 2009) 656 F.Supp.2d 1128(1147 (dismissing ........................ 28

*In re GM Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ............................................................... 21

*In re HP Inkjet Printer Litig.*,
   No. C05-3580, 2010 WL 11488941, at *1 (N.D. Cal. Oct. 1, 2010) ............ 17

*In re Heritage Bond Litig.*,
   No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ............ 21

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ............................................................ 24

*In re Newbridge Networks Sec. Litig.*,
   (D.D.C. Oct. 23, 1998) 1998 WL 765724 ......................................... 23

*In re Nvidia Derivs. Litig.*,
   No. C-06-06110, 2008 WL 5382544. (N.D. Cal. Dec. 22, 2008) ............... 29

*In re Pacific Enters. Secs. Litig.*,
   47 F.3d ........................................................................................ 31

*In re Tableware Antitrust Litigation*,
   484 F.Supp.2d 1078 (N.D. Cal. 2007) ............................................... 25

*Knight v. Red Door Salons  Inc.*,
   (N.D. Cal. Feb. 2, 2009, No. 08-01520) 2009 WL 248367 ...................... 31

*Labriola v. Clinton Entertainment Management, LLC*,
   2017 WL 1150989 (N.D. Ill. March 28, 2017) ..................................... 26

*Leverage v. Traeger Pellet Grills, LLC*,
   (N.D. Cal. June 28, 2017, No. 16-CV-00784) 2017 WL 2797811 ............. 23

*Lynn's Food Stores, Inc. v. United States*,
   679 F.2d 1350 (11th Cir. 1982) ....................................................... 33

*Matson v. 7455, Inc.*,
   2000 WL 1132110 (D. Or. 2000) ..................................................... 26

*McCrary v. Elations Co., LLC,*
   No. EDCV 13-00242 JGB, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) .................................... 20

*Merch. Disc. Antitrust Litig.,*
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) .................................................................................. 24

*Misra v. Decision One Mortg. Co.,*
   No. SACV070994, 2009 WL 4581276 (C.D. Cal. Apr. 13, 2009)............................................ 25

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306(1950)............................................................................................................ 34

*Nat'l Rural Telecomms. Coop v. DirecTV,*
   221 F.R.D. 523 (C.D. Cal. 2004) .................................................................................. 30, 31

*Nelson v. Texas Sugars, Inc.,*
   2020 WL 7134143 (5th Cir. 2020) .................................................................................. 25

*Officers for Justice v. Civil Serv. Comm'n,*
   688 F.2d 615 (9th Cir. 1981) ........................................................................................ 24

*Ogbuehi v. Comcast of California/Colorado/Florida/Oregon, Inc.,*
   No. 2:13–cv–00672, 2014 WL 4961109 (E.D. Cal. Oct 2, 2014) ............................................ 20

*Perez-Olano v. Gonzalez,*
   248 F.R.D. 248 (C.D. Cal. 2008) ................................................................................ 19

*Petruzzi's, Inc. v. Darling–Delaware Co., Inc.,*
   880 F.Supp. 292 (M.D. Pa. 1995) ................................................................................ 31

*Pigford v. Glickman,*
   185 F.R.D. 82 ........................................................................................................ 24

*Reed v. 1-800 Contacts, Inc.,*
   2014 U.S. Dist. LEXIS 255, 2014 WL 29011 (S.D. Cal. Jan. 2, 2014) ................................ 23

*Rodriguez v. Hayes,*
   591 F.3d 1105 (9th Cir. 2010) .................................................................................. 18

*Roe v. Frito-Lay, Inc.,*
   No. 14-CV-00751, 2017 WL 1315626 (N.D. Cal. Apr. 7, 2017) ............................................ 32

*Roe v. SFBSC Mgmt., LLC,*
   No. 14-CV-03616-LB, 2017 WL 4073809 (N.D. Cal. Sept. 14, 2017)................................ 2, 3

*Roes, 1-2 v. SFBSC Mgmt., LLC,*
   944 F.3d 1035 (9th Cir. 2019) ...................................................................................... 8

*Ruffin v. Entertainment of the Eastern Panhandle,*
   845 F.Supp.2d 762 (N.D W.Va. 2012) ........................................................................ 26

*Strube v. Am. Equity Investment Life Ins. Co.*,
  226 F.R.D. 688 (M.D. Fla. 2005) ............................................................. 23

*True v. American Honda Motor Co.*,
  749 F.Supp.2d 1052 (C.D. Cal. 2010) ..................................................... 31

*Urbino v. Orkin Svcs. of Calif., Inc.*,
  (9th Cir. 2013) 726 F.3d 1118 ................................................................ 27

*Valentino v. Carter–Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) .................................................................. 20

*Van Ba Ma v. Covidien Holding, Inc.*,
  No. SACV 12-2161) 2014 WL 2472316 (C.D. Cal. May 30, 2014) ........... 24

*Vasquez v. Coast Valley Roofing, Inc.*,
  670 F.Supp.2d 1114 (E.D. Cal. 2009) ................................................ 24, 31

*Viceral v. Mistras Grp., Inc.*,
  (N.D. Cal. Oct. 11, 2016, No. 15-CV-02198) 2016 WL 5907869 ............ 23

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................... 18

*Zackaria v. Wal-Mart Stores, Inc.*,
  No. ED CV 12–1520, 2015 WL 2412103 (C.D. Cal. May 18, 2015) .......... 26

**State Cases**

*Acropolis McLoughlin*,
  945 P.2d .............................................................................................. 26

*Amaral v. Cintas Corp. No. 2*,
  (2008) 163 Cal.App.4th 1157 ................................................................. 28

*Buel v. Chowder House, Inc.*,
  2006 WL 1545860 (Cal. App. 1 Dist. 2006) ................................... 25, 26, 27

*Dynamex Operations West, Inc. v. Superior Court*,
  4 Cal.5th 903 (2018) ............................................................................... 5

*In re Microsoft I-V Cases*,
  135 Cal.App.4th 706 (2006) ................................................................... 25

*Moody v. Razooly*,
  2003 WL 464076 (Cal. Ct. App. Feb. 25, 2003) ...................................... 26

*Rebney v. Wells Fargo Bank*,
  220 Cal. App. 3d 1117 (1990) ................................................................ 29

*State of Oregon v. Acropolis McLoughlin, Inc.*,
  945 P.2d 647 (Or. App. 1997) ................................................................ 26

*Trotsky v. Los Angeles Federal Savings & Loan Ass'n.*,
   48 Cal.App.3d 134 (1975) ........................................................................... 24

*Wershba*,
   91 Cal. App. 4th ........................................................................................ 22

**<u>Federal Statutes</u>**

29 U.S.C. § 216(b) .................................................................................. 32, 33

29 U.S.C. §§ 206, 207 ................................................................................. 33

**<u>Federal Rules</u>**

Fed. R. Civ. P. 23(a)(3) ............................................................................... 19

Fed. R. Civ. Pro. 23 (a) ......................................................................... 17, 18

Fed. R. Civ. Pro. 23 (a) and (b)(3) ............................................................. 17

Fed. R. Civ. Pro. 23 (b)(3) ............................................................... 17, 18, 19

Fed. R. Civ. Pro. 23(b)(3)(A)–(D) ............................................................. 20

Fed. R. Civ. Pro. 23(e)(2) ........................................................................... 21

Federal Rule of Civil Procedure, Rule 15(a)(2) ......................................... 16

Rule 23(a)(4) ............................................................................................... 19

Rule 23(E) ................................................................................................... 21

## I.  **INTRODUCTION**

The Court is more than familiar with the cases before it at this juncture.  The parties have reached a global settlement and now move for preliminary approval of the settlement, proposed class notice and setting a schedule for objections, opt-outs and the final fairness hearing.  Specifically, and together, *Jane Roes 1-2 v. SFBSC Management, LLC,* Civil Case No. 3:14-cv-03616-LB (the "San Francisco Action"), and *Jane Roe 1 and 2 v. Deja Vu Services, Inc., et al.,* Civil Case No. 19-cv-03960-LB (the "San Diego Action," collectively the "Actions") respectfully seek preliminary approval of their Release and Settlement Agreement (the "Settlement Agreement," or "Settlement") with Defendants SFBSC Management, LLC ("SFBSC"), Deja Vu Services, Inc. ("Services"), and Harry Mohney ("Mohney"), along with all of the Defendant Entities identified in **Exhibit A** attached to the Settlement Agreement (hereinafter collectively referred to as "Defendants").[1]

The proposed Settlement was reached only after an informed analysis of the claims and arm's length negotiations by experienced counsel.  Under the Settlement Agreement, Defendants have agreed to pay the non-reversionary sum of $4,500,000.00, and provide another $1,000,000 in enhanced employment benefits, to resolve Plaintiff's outstanding claims on a class and collective basis.  After deducting any Court-approved attorneys' fees and expenses, incentive awards, administration costs, and payments to the Labor & Workforce Development Agency ("LWDA"), the net fund will be distributed to all qualified Class Members.

This Settlement provides substantial recovery for Defendants' alleged wage and hour violations.  Plaintiffs estimate that the Settlement, if approved, would result in a **$274.35** payment (before tax) for the average employee.  This relief is immediate, avoids the risk of further litigation, and is *in addition* to, and is not reduced by, the substantial payments already made by the Clubs to the Class Members while they were performing as independent contractors as reflected by IRS Forms 1099-MISC previously issued to the Class Members.  Accordingly, this Settlement is a fair and reasonable resolution of the Parties' disputes, and notice should therefore be provided to the Class.

---

[1] The Settlement Agreement is attached to Declaration of Jason Thompson, concurrently filed herewith ("Thompson Decl."), as Exhibit B.  Any defined terms used within this Motion are given the same meaning is established within the Settlement Agreement.

## II.   <u>BACKGROUND</u>

The background of the disputes that led to proposed Settlement are storied, involving several related actions, two appellate decisions, multiple parties, and several mediations.  A more detailed recitation of the underlying events and actions can be found in the declarations submitted herewith.

### A.   The San Francisco Action

On August 8, 2014, two Entertainers identified as Jane Does 1-2 filed the San Francisco Action, which is currently pending before this Count.  Declaration of Joel Young, concurrently filed herewith ("Young Decl."), at ¶ 2. The San Francisco Action Plaintiffs asserted that they, and all Entertainers who performed at eleven nightclubs in San Francisco, California, were misclassified as independent contractors, that they were really employees and therefore entitled to certain wages and other consideration, and that a management company that provided management and consulting services to those nightclubs ("SFBSC") was their joint employer.  *Id.*, ¶ 2.

In March of 2017, following extensive motion practice, an appeal to the United States Court of Appeals for the Ninth Circuit, three mediations under the direction of the Ninth Circuit ADR program, and lengthy negotiations, the parties to the San Francisco Action executed a Settlement Agreement and Release (the "San Francisco Settlement") that settled, pursuant to and limited by the terms thereof, the San Francisco Action.  *Id.*, ¶ 3.

The Court is aware of the terms of the previous San Francisco Settlement, so the Plaintiffs will only address it briefly.  The San Francisco Action Settlement provided Cash Payments, Dance Fee Payments, Residual Dance Fee Payments, and changes to those defendants' business practices, which conferred a direct financial benefit on the class members there.  *Roe v. SFBSC Mgmt., LLC*, No. 14-CV-03616-LB, 2017 WL 4073809, at *3 (N.D. Cal. Sept. 14, 2017).  "The Gross Settlement Value" was $5 million, broken into tiers and benefits: (1) First Tier Cash Pool: $2 million; (2) Second Tier Cash Pool: up to $1 million; (3) Dance Fee Payments and Residual Dance Fee Payments: $1 million; and (4) changes to the defendants' business practices (estimated to confer benefits to class members in excess of $1 million)."  *Id.* at *3-4.  Under the San Francisco Settlement, class members could have elected to receive a Cash Payment based on the number of months performed (up to $800) or a Dance Fee Payment.  *Id.*

The San Francisco Settlement provided injunctive relief, including the creation of an "enhanced offer of employee status" pursuant to which each settling nightclub's management personnel were required to provide entertainers the option of performing as employees, who were to be guaranteed to earn at least fifteen dollars ($15.00) per hour and commissions of at least twenty percent of the dance fees earned from their performances in excess of the first one hundred fifty dollars generated by their sale of private dances.. *Id.* The nightclubs were also required, pursuant to the Settlement, to present entertainers with a "Selection Document" which explained that those entertainers who chose employee status were giving up rights that independent contractors were afforded. *Id*

Over objections submitted by the Firm of Lichten & Liss-Riordan, P.C., on behalf of three entertainers who were pursuing claims in the related "*Hughes*" action (Sarah Murphy, Poohrawn Mehraban, and Devon Locke; "the San Francisco Objectors"), this Court granted preliminary approval of the San Francisco Settlement on April 14, 2017 (the "San Francisco Preliminary Approval Date"). After additional objections submitted by Lichten & Liss-Riordan, the Court granted final approval of the San Francisco Settlement on September 14, 2017. Young Decl., at ¶ 3.

On October 12, 2017, the San Francisco Objectors filed a notice of appeal to the Ninth Circuit Court of Appeals. As discussed further below, the Ninth Circuit ultimately reversed this Court's final approval order in December 2019, and remanded the case for further proceedings.

### B. The Michigan Action

On March 10, 2016, an entertainer identified as Jane Doe 1 filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 1:16-cv-10877, alleging that she and all other entertainer who performed at DV Saginaw, LLC ("Deja Vu Saginaw"), were misclassified as non-employees or as "independent contractors" by their alleged employer(s) (the "Michigan Action"). Thompson Decl., at ¶ 14. Following substantial litigation (including the denial of certain motions for summary adjudication brought by the plaintiff-entertainers therein) and subsequent lengthy negotiations, counsel in the Michigan Action ultimately arrived at a settlement that included the expansion of the Michigan Action to include all then-existing nightclubs throughout the United States that were associated (as that terms was broadly defined in the actual settlement

document) with Déjà Vu Consulting, Inc., a Michigan corporation, with the exception of any such "associated" nightclubs that were located in San Francisco, California (i.e., those nightclubs already involved in the San Francisco Action). *Id.*, ¶¶ 14-15.

In February of 2017, the parties to the Michigan Action executed a Release and Settlement Agreement (the "Michigan Action Settlement"). *Id.*, ¶ 15. Over objections submitted by, among others, Lichten & Liss-Riordan on behalf of two California entertainers named Brittney Halverson and Eva Cabrera, the federal district court granted final approval of the Michigan Action Settlement on June 16, 2017. *Doe 1-2 v. Deja Vu Servs., Inc.*, No. 2:16-CV-10877, 2017 WL 2629101, at *1 (E.D. Mich. June 19, 2017).

The Michigan Action Settlement provided $6.55 million in monetary relief, divided into three categories: $1 million toward a "cash pool", $4.5 million toward a "secondary pool," and $900,000 in attorneys' fees. Thompson Decl., ¶ 17. Entertainers could select between a one-time payment from the cash pool or payment from the secondary pool in the form of either (depending upon which business model was adopted by the club) rent credits that could be used, or dance fee payments that could be obtained, at clubs governed by that settlement (each time a class member performed at one of the participating clubs, credits or payments from the secondary pool would either cover 60% of her daily rent or allow her to collect up to $100 in dance fees). *Id.* Depending on how many months the entertainer has performed at a participating club, the total amount of money from the secondary pool was capped at between $200 and $2,000. *Id.*

Along with certain other objectors, Lichten & Liss-Riordan, on behalf of the entertainers who submitted the Michigan Action Settlement objections, appealed the order granting final approval of the Michigan Action Settlement to the Sixth Circuit United States Court of Appeals.

### C. The San Diego Action

On May 31, 2018, Jane Roes 1-4 filed an action alleging violations of the FLSA and state law in the Superior Court of the State of California, County of San Diego (the "San Diego Action"). *Id.*, ¶ 5. Jane Roes 1-4 asserted, on their own behalf and as representatives of a class and collective, various wage-and-hour claims against the defendants therein arising out of the alleged misclassification of exotic dancers as independent contractors. *Id.*, ¶ 6. The lawsuit was spurred by

1    *Dynamex Operations W.* and California's adoption of the "ABC" test.[2]  *Id.*, ¶ 8.  Subsequent to the

2    filing of that action, the San Diego Action Plaintiffs submitted a letter to the LWDA pursuant to the

3    PAGA, noting their intention to file an amended complaint to add a claim under the PAGA if the

4    LWDA did not act within the specified statutory period of time.  *Id.*, ¶ 7.

5        In the Superior Court, those defendants moved to compel the claims into arbitration (*see*

6    Motion to Compel [ECF No. 10]).  Before such motion could be heard, however, the parties thereto,

7    in an effort to resolve their disputes, to minimize the incurrence of substantial but potentially

8    unnecessary attorneys' fees, and to bring a close to the San Diego Action, engaged in a full day

9    mediation with the Honorable Victor E. Bianchini on July 24, 2018, in San Diego, California.  *Id.*, ¶

10   38.  While they were unable to reach a resolution at the mediation, they outlined the basic terms of a

11   potential settlement and continued to negotiate.  *Id.*  On or about August 1, 2018, those parties reached

12   an understanding as to the general terms the settlement and executed a Letter of Understanding that

13   provided a period for them to attempt to negotiate a full and complete settlement.  *Id.*

14       Yet, this settlement was complicated by the appeals and objections in the pending Michigan

15   and San Francisco Actions, as the objectors in those cases, represented by the Lichten & Liss-Riordan

16   firm, attempted to intervene and object to the general terms of any settlement in the San Diego Action

17   without their participation.  Accordingly, counsel for the plaintiffs in the San Diego Action flew to

18   Boston to meet with representatives of the Lichten & Liss-Riordan firm, which was representing the

19   objectors in these various actions in an attempt to reach global resolution of their objections on all

20   such matters.  *Id.*, ¶ 39.  Lichten & Liss-Riordan was informed of the tentative settlement in the San

21   Diego Action and was invited to participate in a continued mediation if they wished.  *Id.*  Lichten &

22   Liss-Riordan accepted the invitation.  *Id.*

23       Accordingly, the San Diego Action parties and the San Francisco Action parties held another

24   mediation with Mark Rudy (selected at the request of Lichten & Liss-Riordan) on August 17, 2018,

25   with the participation of counsel from Lichten & Liss-Riordan.  *Id.*, ¶ 40.  However, the parties to the

26   San Diego Action and the San Francisco Action were unable to resolve their disputes with Lichten &

27

28       [2] *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018) adopted the "ABC" test
     to distinguish between employees and independent contractors for purposes of enforcing the California
     Industrial Welfare Commission Wage Orders.

1  Liss-Riordan at the second mediation, and then proceeded forward to consummate the proposed

2  settlement contemplated in the Letter of Understanding. *Id.*, ¶ 40. Pursuant to that proposed

3  settlement, defendants in that action would have paid a total of one and one half million dollars

4  ($1,500,000.00) to satisfy the legal claims of the settlement class. *Id.*, ¶ 42. This amount would have

5  included payments to the settlement class, PAGA penalties, administrative costs, incentive award to

6  named plaintiffs, litigation costs, and plaintiffs' attorneys' fees. *Id.*, ¶ 43. Following extensive

7  negotiations as to the terms thereof and in an effort to bring this form of misclassification litigation to

8  an end, the defendants to the San Diego Action also agreed, as demanded by plaintiffs' counsel, to

9  convert the dancers who performed at the defendant clubs to employees by the preliminary approval

10  date; the hearing for which had originally been scheduled to occur on November 2, 2018. *Id.*, ¶¶ 44-

11  45. These terms were all memorialized in a comprehensive Release and Settlement Agreement.

12      As a result of the attempted intervention by seven individuals represented by Lichten & Liss-

13  Riordan (the "Intervenors")[3], the hearing on the motion for preliminary approval of that settlement

14  was continued. *Id.* After the matter was final heard on November 30, 2018, and after having granted

15  the Intervenors' motion to intervene, the San Diego Superior Court denied, without prejudice, the

16  motion for preliminary approval of the November 2018 settlement agreement, stating that it needed

17  more information from defendants' accountant before preliminary approval could be granted. *Id.*, ¶

18  46. The San Diego Superior Court also denied a motion by those defendants to compel those plaintiffs'

19  claims into individualized arbitration. *Id.* Also on November 30, 2018, the San Diego Action

20  Plaintiffs filed a Second Amended Complaint, limiting the named plaintiffs to Jane Roe No. 1 and 2.

21  ECF 1-42.

22      Subsequent to the hearings on the motions discussed above, the Intervenors filed an amended

23  complaint in intervention which named SFBSC as a Defendant for the first time in the San Diego

24  Action. ECF No. 1-53. SFBSC then removed the San Diego Action to the United States District Court

25  for the Southern District of California. *See* Notice of Removal ECF No. 1. Following removal, the

26  defendants to the San Diego Action filed a motion for reconsideration of the San Diego Superior

27

28  _____

[3] The Intervenors were also plaintiffs in the related *Hughes, et al. v. S.A.W. Entertainment, LTD.*, et al., No. 16-3371 (N.D. Cal.) and *Pera v. S.A.W. Entertainment, LTD*, 17-138 (N.D. Cal.) actions pending before this Court.

Court's denial of their motion to compel the plaintiffs in that action into individualized arbitration, as a well as a motion to compel the Intervenors into individualized arbitration.  ECF Nos. 7 & 8. Thereafter, the San Diego Action was transferred to the United States District Court for the Northern District of California.  Order Denying Motion to Remand, ECF No. 19.  The arbitration motions are presently pending before this Court.

**D.      The Appellate Courts Rule in the Michigan and San Francisco Actions.**

On June 3, 2019, the United States Court of Appeals for Sixth Circuit affirmed the federal district court's final approval order in the Michigan Action. *Does 1-2 v. Deja Vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019).  However, on December 11, 2019, the United States Court of Appeals for Ninth Circuit overturned this Court's final approval order in the San Francisco Action. *Roes, 1-2 v. SFBSC Mgmt., LLC,* 944 F.3d 1035 (9th Cir. 2019).  Specifically, the Ninth Circuit concluded that: (1) the class-wide settlement notice was inadequate as it utilized only a single mailed notice and no electronic notice; and (2) because this Court failed to expressly apply a heightened level of scrutiny to the settlement in light of what the Ninth Circuit viewed to be a "Clear Sailing Agreement" with respect to attorneys' fees and expenses, the amount of the incentive awards, and concerns about the reversionary aspect of the Second Tier Cash Pool and Dance Fee Payment Pool, warranted further review.

Combined, these ruling meant claims by entertainers who performed at the non-San Francisco-based California nightclubs were extinguished by the Michigan Action, while claims of the entertainers who performed at the San Francisco-based clubs (i.e., the claims alleged in the San Francisco Action) remained.

Given the Ninth Circuit decision, the Court ordered the Parties, including the San Francisco Action plaintiffs and the San Diego Action plaintiffs, as well as the Intervenors, to appear at a joint case management conference on January 16, 2020.  ECF No. 72.  The San Francisco and San Diego Actions parties expressed their intention to renew their settlement efforts towards possible joint resolution.  [ECF No. 73].  The plaintiffs in the San Francisco Action and San Diego Action agreed to stay their cases during settlement discussions.  The cases were referred to mediation, and a case management conference was set for February 20, 2020.  ECF No. 75.

**E.      Efforts to Settle the San Francisco and San Diego Actions**

In a further effort to resolve all the outstanding claims, the parties in the San Francisco Action and San Diego Action, together with Lichten & Liss-Riordan, conducted an additional full day mediation before Tripper Ortman on March 11, 2020 (literally days before the initiation of nation-wide pandemic lockdowns). Thompson Decl., at ¶¶ 58-60. Plaintiffs' counsel engaged in extensive arms-length negotiations with defense counsel, with a view toward achieving monetary recovery for the class members in the San Francisco Action and the San Diego Action and to comprehensively address the worker misclassification issue. Plaintiffs' counsel benefited from the extensive settlement discussions and discovery that had been conducted in the prior efforts to settle the San Francisco Action and the San Diego Action. *Id*. The Parties also had guidance from various legal decisions, including the appeals in the San Francisco Action. *Id*.

The March 11, 2020 mediation focused on creating a workable settlement structure. *Id.*, ¶ 61. As discussed, a material component of this comprehensive Settlement is the agreement to convert the Class Members to, and/or treat them and to continue to treat them as, employees. *Id.* Another material component to the Settlement was securing a base level of compensation *above* the minimum wage as required by law, including required commission payments to entertainers. Ultimately, the Parties were unable to resolve their disputes with Lichten & Liss-Riordan at this third mediation. *Id.* However, after extensive negotiations, the parties in the San Francisco Action and the San Diego Action were able to reach consensus on the basic structure of a comprehensive resolution. *Id.* Nonetheless, the Parties still had to reduce their agreement to a final form. *Id.* Unfortunately, the timing of the settlement proved problematic. On March 16, 2020, the public health officers of San Francisco counties announced a legal order directing the city's residents to shelter at home. *Id.*, ¶ 62. Three days later, Governor Newsom issued a statewide stay at home order. *Id.* These orders effectively shut down Defendants' operations and any chance of immediately effectuating the Parties' settlement. *Id.*, ¶ 63. Because of the unexpected material change in circumstances, the settlement negotiations were paused, only to restart again in April 2021, when Defendant's clubs began to reopen. *Id.*, ¶¶ 63-64.

Over the next few months, the Parties discussed renewing their previously negotiated settlement. *Id.* The main obstacle was the uncertainty due to the continuing pandemic. *Id.*, ¶ 64. Not

only did the pandemic close Defendants' operations, limiting Defendants' financial resources, but it also made future revenue difficult to gauge.  *Id.*  The Parties were finally able to agree to terms in June 2021 and the Settlement Agreement was drafted and finally executed in September 2021.  *Id.*, ¶ 65, Ex. B.

## III.   THE TERMS OF THE SETTLEMENT AGREEMENT

### A.   Consolidation and Amendment of the Complaints

Under the proposed Settlement, the parties in the San Francisco Action and the San Diego Action seek to resolve the wage and hour (and related) claims of the Settlement Class, including Plaintiffs' state labor law, FLSA and PAGA claims.  To do so, the Parties have agreed to consolidate the San Francisco Action and San Diego Action for settlement purposes only.  Settlement Agreement, at ¶ 3.1.  The Parties further agree that the Named-Plaintiffs shall file the Amended Complaints, which will include all the Defendant Entities identified in the Settlement.  *Id.*, ¶ 3.4(a).

### B.   The Settlement Classes

The Settlement Class proposed under the Agreement includes:

> Any individual who Performed as an Independent Professional Entertainer (independent contractor) at one or more of the Clubs at any time during the applicable Class Periods, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club during the Class Periods.

*Id.*, at ¶¶ 2.11, 2.82-83.  The Class Period is defined as:

> a)    the time period from August 8, 2010 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the San Francisco Clubs (the "San Francisco Class Period"); and

> b)    the time period from February 8, 2017 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the Greater California Clubs (the "Greater California Class Period").

*Id.*, at ¶ 2.14.  The reason for the two different class periods is that the San Francisco Action was filed in August 2014, well before the San Diego Action was filed in May 2018.  Additionally, the claims in the San Francisco Action were only brought against Clubs located in San Francisco, (i.e., the "San Francisco Clubs"), as opposed to claims in the San Diego Action, which were brought against Clubs located through California with the exception of San Francisco (i.e. the "Greater California Clubs").

1    Thompson Decl., ¶ 67.  Plaintiffs estimate the Settlement Class to include about 8,408 individuals.

2    *Id.*, ¶ 69.

3            **C.      The Benefit to the Class**

4            Generally, the Settlement consists of the following major components:

5    •    Monetary class benefits consisting of Cash Payments, Dance Fee Payments,
         Enhancement Payments, the PAGA Payments, the Attorneys' Fees and Expenses

6        Award, and the Administrative Costs valued at $4,500,000; and

7    •    Conversion of the entertainers to employees utilizing "enhanced" terms of employment
         (renumeration and benefits for the Settlement Class Members over-and-above what the

8        law requires), with enhanced employment benefits valued at a minimum of $1,000,000
         per year.

9    Settlement Agreement, at ¶¶ 5.1-2.

10           The components of the monetary Settlement Consideration are (1) a Cash Pool of $4,000,000

11   and a Dance Fee Pool of $500,000.  *Id.*, at ¶ 5.2.  To address one of the Ninth Circuit's concerns with

12   the first settlement in the San Francisco Action, no portion of the Settlement Consideration is

13   reversionary.  Defendants are obligated to pay the full $4.5 million and provide enhanced terms of

14   employment that amount to at least $1 million in benefits.  *Id.*, at ¶ 5.1.

15           The Cash Pool will be used to pay the requested total Enhanced Payments of $35,000, the

16   PAGA Payment of $125,000 (of which 75% (*i.e.* $93,750) will be allocated as the LWDA PAGA

17   Payment and the remaining 25% (*i.e.* $31,250) will be allocated as the Settlement Class Members'

18   PAGA Payment), estimated Administrative Costs of $90,000; and the Attorneys' Fees and Expenses

19   Award as ordered by the Court.  *Id.*, at ¶ 5.2.  The Cash Pool will be distributed as follows:

20       •    **The PAGA Payment**: thirty-one thousand two hundred fifty dollars ($31,250) will be
21            paid to Settlement Class Members on a pro rata basis, based on the ratio determined
              dividing a Settlement Class Member's (IRS) Form 1099 Payments during her Class
22            Period(s) by the total of all Form 1099 Payments received by all Settlement Class
              Members during their applicable Class Periods (*Id.*, at ¶¶ 6.2, 6.3.2); and
23
         •    **The Net Cash Fund**: will be paid to a Settlement Class Member on a pro rata basis,
24            based on the ratio determined by dividing her  Form 1099 Payments during her Class
              Period(s) by the total amount of Form 1099 Payments received by all Settlement Class
25            Members during their applicable Class Periods (*Id.*, at ¶ 6.3.1).

26   The Net Cash Fund is estimated at between $1,745,000 and $2,245,000.[4]

27   _____

28   [4] The Cash Pool will be between $4,000,000 and $4,500,000, depending on the Unclaimed Dance
     Fee Pool.  Settlement Agreement, at ¶ 5.2.  The Net Cash Fund is the Cash Pool ($4,000,000-
     $4,500,000), minus the PAGA Payment of $125,000, estimated Administrative Costs of $90,000,

                                                    10

Defendants shall be afforded time to fund the settlement – due in large part to COVID-19. *Id.*, at ¶ 5.3; Thompson Decl., at ¶ 75. The Cash portion of the Settlement will be funded in four installments: Defendants shall pay the Notice and Administrative Fund within five (5) business days of the Preliminary Approval Date; an initial payment of two million dollars ($2,000,000) by March 1, 2022; a second payment of one million dollars ($1,000,000) by March 1, 2023; and a third payment of the balance of the funds (including the Unclaimed Dance Fee Pool, if any) by March 1, 2024. *Id.*, at ¶ 5.3. Payments to the Class Members will be made in three installments, on a pro rata basis after the initial, second, and third payments detailed above. Settlement Agreement, at ¶ 5.5.2. The LWDA's PAGA Payment, the Enhancement Payments, and fifty percent (50%) of the Attorneys' Fees and Expenses Award, will be paid out of the initial payment. *Id.* Twenty five percent (25%) of the Attorneys' Fees and Expenses Award will be paid out each subsequent payment. *Id.* This structure ensures that Class Counsel only get paid as the Settlement Class Members gets paid.

Settlement Class Members shall have 180 days to cash Settlement Checks from the date on the Settlement Checks. *Id.*, ¶ 6.6. If any Settlement Check remains uncashed after 180 days (after skip tracing), the Settlement Administrator will deliver the funds to the California State Controller's Unclaimed Property Fund to be held in the Settlement Class Member's name. *Id.*, ¶ 6.3.1.

A $500,000 Dance Fee Pool will be made available to Settlement Class Members who select to obtain their Settlement Payment in the form of Dance Fee Payments (additional commissions). *Id.*, ¶¶ 2.27, 7.1; *Id.*, Ex. D (Dance Fee Payment Election Form). Dance Fee Payments will entitle the Class Member to receive 100% of the "Dance Fee" payment from customers for the Settlement Class Member's dance services. Dance Fees are the mandatory charge that customers are required to pay in order to purchase such Performances or sessions at the Defendant Clubs and under the employment structure negotiated as part of this Settlement, those sums would otherwise be the property and gross income of the Clubs. The Settlement grants the Settlement Class Members entitlement to certain of those proceeds. *Id.*, ¶¶ 2.19, 7.1, 7.3. The Dance Fee Pool will be distributed based on the same formula used for the Cash Payments. *Id.*, ¶¶ 7.1, 6.3.1. However, if the Dance Fee Pool claims exceed

requested Enhanced Payments of $35,000, and requested Attorneys' Fees (which will not exceed thirty-five percent (35%) of the Settlement or $ 1,925,000) and Expenses Award (which will not exceed $80,000). Accordingly, the Net Cash Fund will be between $1,745,000 and $2,245,000.

$500,000, the distribution will be subject to a pro rata reduction (dividing the Dance Fee Claimant's Form 1099 Payments into the amount of Form 1099 Payments received by all Dance Fee Claimants; and (2) then multiplying that number by $500,000).  *Id.*, ¶ 7.1.[5]

However, if less than the total Dance Fee Pool is claimed, the Settlement provides for an Unclaimed Dance Fee Pool (the portion of the $500,000 not claimed through the Dance Fee Payment Election Form), which will then be paid to the Class, in cash.  *Id.*, ¶¶ 2.91, 5.3, 7.1.  Additionally, if a Settlement Class Member elects to receive her Settlement Payment in the form of Dance Fee Payments but does not obtain all of her Dance Fee Payments within the Dance Fee Payment Collection Period, the unused amount will be issued to the Dance Fee Claimant as a check.  *Id.*, ¶¶ 2.23, 2.93, 5.3, 7.6.  Accordingly, the Dance Fee Payments are entirely non-reversionary and amount to the face value of the payment.[6]

In addition to monetary relief, the Settlement provides valuable non-monetary benefits to the Class Members who continue to perform at the Clubs, <u>regardless</u> of whether they exercise their right to opt into the case.  *Id.*, ¶ 9.1.  With this, the Settlement brings to an end the extensive history of litigation against these Defendants concerning the distinction between employees and independent contractors, and provides terms of employment to the Entertainers that are more beneficial than what the law requires.

Specifically, the Settlement requires the Clubs to convert all Entertainers who will be performing in their facilities to employees in accordance with applicable law and on monetary terms that are more favorable as specified for employee-entertainers in the Michigan Action Settlement and in the San Francisco Action Settlement for the San Francisco Clubs.  *Id.*, ¶ 9.1.  As employees, Class Members and other subsequent Entertainers will be eligible for Social Security, Medicare, Worker's Compensation and unemployment insurance, as well as to protection under all federal, state and local

---

[5] For Settlement Class Members who do not timely submit a Properly Completed Opt-Out Form,, they will be presumed to have selected to obtain their Settlement Payment in the form of Cash Payments.  *Id.*, at ¶ 4.11.

[6] There are some limitations on the Dance Fee Payments.  A Dance Fee Claimant must elect one Club from which to receive her Dance Fee Payments, for accounting purposes. Id., ¶ 7.2.  A Properly Completed Dance Fee Payment Request Form must be submitted at least seven business days before the Claimant desires to Perform.  Id.; see also id., Ex F ("Dance Fee Payment Request Form").  The clubs can limit the number of Claimants receiving Dance Fee Payments on any one Date of Performance to seven such dancers on a first come/first served basis.  Id., ¶ 7.3.

laws applying to or affecting employees, including the National Labor Relations Act, Title VII of Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefits Protection Act, the Americans with Disabilities Act, the Family Medical Leave Act and the Fair Labor Standards Act, as well as, among other things, commission payments of a minimum of 40% on the dance sales they engender (which would *not* be required to be remitted by law) for at least one year following final approval.

### D.   Release of Claims

The full description of the release is found in Article XII of the Agreement, but is limited to the claims at issue in the Complaint, in the Amended Complaints for Settlement that are to be filed, or that are or could be based on the allegations set forth in those pleadings.  *See id*., at ¶ 2.85.  As to the FLSA claims, only those members who consent to join will be bound to the FLSA release.  *Id.*, at ¶¶ 4.12, 6.5.  The Parties have agreed that the Settlement Checks will contain opt in language indicating a Class Member's consent to join the settlement and to release their FLSA claims.  *Id.*  All Class Members who accept their monetary benefits – by cashing the Settlement Check – or who submit a Dance Fee Payment Election Form entitling them to Dance Fee Payments, will be releasing their FLSA claims. *Id.*

### E.   Class Notice

Should this Settlement be preliminarily approved, the Plaintiffs propose that the Notice of Class Action Settlement, attached to the Settlement Agreement as Exhibit D, be sent to Class Members.  *Id.* ¶¶ 2.12, 4.4.  The Class will be mailed and emailed (where available) Notice and a Dance Fee Payment Election Form.  *Id.*, ¶¶ 2.56, 4.4.  These notices will be designed to ensure the confidentiality of the Class Members.  *Id.*, ¶ 4.4.  At the same time, the Settlement Administrator shall create a website with the Notice and other important information.  *Id.*, ¶ 4.7.

If the Class Notice mailed to a Class Member is returned within twenty-one (21) days of the initial mailing with a forwarding address provided, the Class Notice will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return.  *Id.*, ¶ 4.5.  If no forwarding address is provided, the Settlement Administrator shall perform a skip trace using the National Change of Address ("NCOA") database, and, if an alternative address is found, the Class Notice will be re-

13

1   sent by the Settlement Administrator to the alternative address within seven (7) days.  *Id.*

2          Additionally, Notice will be provided through publication designed to reach the Class.  Notice

3   will be posted in each of relevant Club's dressing rooms and will remain up for ninety days after the

4   date of filing the Motion for Final Approval.  *Id.*, ¶ 4.6; Ex. G (proposed Posted Notice).  Notice will

5   also be provided to the International Entertainment Adult Union for posting on their internet message

6   board and to be emailed to their subscriber list.  *Id.*, ¶ 4.8.  Notice will also be posted to the

7   StripperWeb.com "Stripping (was Stripping General)" discussion thread for eight (8) weeks.  *Id.*

8   Finally, notice of the Settlement will be provided by online advertising campaign directed at social

9   media websites.  *Id.*, ¶ 4.9.  These Electronically Posted Notices will provide hyperlinks to the

10  Settlement Website.  *Id.*; *see also id.*, Ex. G (proposed Electronically Posted Notice).  A Social Media

11  Notice Fund of $10,000 will be established to effectuate posting of the Social Media Notice.  *Id.*

12         Settlement Class Members will have at least sixty (60) days from the Notice Date to object to

13  or opt-out of the Settlement, and to elect to receive Dance Fee Payments under the Settlement.  *Id.*, ¶

14  2.25, 2.60.  No later than thirty (30) days prior to the expiration of the Opt Out Period, the Settlement

15  Administrator shall effectuate Reminder Notices to the Class by mail and Email and through the

16  International Entertainment Adult Union.  *Id.*, ¶ 4.10.  This multiple prong approach represents the

17  best practicable notice of the Settlement to Class Members.  Notice will also be provided that complies

18  with the requirements of the Class Action Fairness Act of 2005 and PAGA.

19         This robust notice process addresses the concerns raised by the Ninth Circuit in its decision

20  reversing final approval of the first settlement in the San Francisco Action.[7]  Unlike the notice process

21  in that settlement, notice of this Settlement will not comprise of a "single mailed notice."  Indeed, the

22  litigants here are following the recommendations of the Ninth Circuit and agree to the posting of notice

23  of the Settlement on StripperWeb.com and using all other reasonably available technology to ensure

24  the widest possible dissemination of the Notice.  *See,* Ninth Cir. Op. at Doc No. 199, p. 22.

25  **IV.    LEAVE TO FILE THE AMENDED COMPLAINTS FOR SETTLEMENT SHOULD
        BE GRANTED TO ALLOW A GLOBAL SETTLEMENT**

26

27         Pursuant to Federal Rule of Civil Procedure, Rule 15(a)(2), "a party may amend its pleading

28

---

[7] See, Doc. No. 199 at pp. 15 – 23.

14

only with the opposing party's written consent" or, alternatively, with leave of the Court. Given the current posture of the case, the requirements of Rule 15(a)(2) are met. Here, the litigants have stipulated, as part of the Settlement Agreement, that the Named Plaintiffs may amend their complaints to allow the settlement of these two Actions before a single court, avoiding duplication of efforts that would result from disjointed and overlapping settlements. Settlement Agreement, at ¶ 3.4(a). Accordingly, there is good cause to allow the amendment of Named Plaintiffs' complaints, attached as Exhibits B and C to the Settlement Agreement.

## V. THE ACTIONS SHOULD BE PRELIMINARILY CONSOLIDATED

The litigants also agreed that the San Francisco Action and the San Diego Action may be consolidated for purposes of settlement. *Id.*, ¶ 3.2. Rule 42(a) allows for consolidation of actions if they involve common question of law or fact. FED. R. CIV. P. § 42. Essentially, Rule 42 is "invoked to expedite trial and eliminate unnecessary repetition and confusion." *Devlin v. Transp. Commc'ns Int'l Union*, 175 F.3d 121, 130 (2d Cir.1999) (internal quotation marks omitted). "[C]onsolidation should be considered when savings of expense and gains of efficiency can be accomplished without sacrifice of justice." *Id.* (emphasis and internal quotation marks omitted). Given that the San Francisco Action and the San Diego Action involve many of the same branded Clubs, the same allegations of the worker misclassification, and/or the same legal issues under California and federal law, as well as the fact that there are numerous Entertainers who would be potential class members in *both* the San Francisco Action and the San Diego Action if those two matters were litigated or settled separately, the litigants are seeking a global resolution of their claims and believe that it will be more efficient to administer these settlements together in one action. Accordingly, these Actions should be consolidated for settlement purposes. *See In re HP Inkjet Printer Litig.,* No. C05-3580, 2010 WL 11488941, at *1 (N.D. Cal. Oct. 1, 2010).

## VI. THE PROPOSED SETTLEMENT CLASS MEETS ALL THE REQUIREMENTS OF CLASS CERTIFICATION

In order to effectuate the proposed Settlement, Plaintiffs also move for certification of the Settlement Class. At the preliminary approval stage, the Court's threshold task is to ascertain whether the proposed settlement class is maintainable under FED. R. CIV. PRO. 23 (a) and (b)(3). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). To qualify for certification of a "settlement-

only class," the class must be so numerous that joinder of all members is impracticable; there must be questions of law or fact common to the class; the claims or defenses of the representative parties are typical of the claims or defenses of the class; and the representative parties will fairly and adequately protect the interests of the class.  FED. R. CIV. PRO. 23 (a).  Additionally, common questions must "predominate over any questions affecting only individual members," and class resolution must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. PRO. 23 (b)(3).

### A.   Numerosity

In this case, the proposed Settlement Class is both numerous and ascertainable. Here, evidence produced during the course of settlement negotiations shows that the estimated Settlement Class is comprised of approximately 8,408 members.  Thompson Decl., at ¶ 69.  It is clear that joinder of that many people is impracticable and that the numerosity requirement is satisfied.

### B.   Predominance and Commonality

The Court next must determine whether questions of law and fact common to the Class are substantially similar and predominate over questions affecting the members individually. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 349 (2011).  "All questions of fact and law need not be common to satisfy the rule."  *Hanlon,* 150 F.3d at 1019).  Rather, commonality is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *See Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010).  Similarly, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Accordingly, courts often examine "commonality under Rule 23(a) together with predominance under Rule 23(b)(3)." *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc*., No. 15-CV-6314, 2017 WL 1806583, at *6 (N.D. Cal. May 5, 2017), *amended sub nom.*, 2018 WL 558844 (N.D. Cal. Jan. 25, 2018).

In this case, each Class Member had similar job duties (as exotic dancers), were subject to the same alleged misclassification scheme, were not provided meal and rest breaks (or the resulting pay premium), and have similar tip related claims.  *See* Settlement Agreement, Ex.'s. B-C.  The Class's

alleged injury stems from Defendants' common business practice, *i.e.,* classifying exotic dancers Performing at the Clubs as independent contractors as opposed to employees. *See id.*

When compared to any individual issues, such as damages, common questions of law or fact clearly predominate. The questions of: (1) whether dancers were misclassified as independent contractors; (2) whether Defendants' tip-sharing practices are unlawful; (3) whether the entities and persons who dictated those policies are joint employers; (4) whether offsets apply to negate any recovery of lost wages; and (5) whether the contracts signed by the Entertainers are enforceable contracts, are entirely common and must be resolved in each Class Member's case.

Here, common facts establish that all dancers in the Class were uniformly classified as independent contractors and subjected to similar rules and working conditions. If application of these common facts to the relevant test for employment status under the wage and hour laws establishes that one dancer was misclassified, it will also establish that all dancers were misclassified. Hence, the predominance requirement is satisfied, particularly for settlement purposes.

### C.    Typicality

Plaintiffs must also establish that their claims are "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508 (citation omitted). A plaintiff's claim is typical "if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 257-58 (C.D. Cal. 2008). Claims need not be "substantially identical," but only "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

The typicality requirement is fulfilled because Plaintiffs and the absent Class Members have the same injury, resulting from the violations of the same Labor Code sections. Additionally, the Named Plaintiffs, like every other member of the Class, worked as exotic dancers (nude and/or topless) at Defendants' Clubs and were classified as independent contractors according to company policy. Accordingly, the Named Plaintiffs' claims coincide with those of the other Class Members.

### D.    Adequacy

The Ninth Circuit has articulated two criteria for determining adequacy of representation under

17

Rule 23(a)(4): "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Both elements are met here.

The Named Plaintiffs have declared their willingness to assume the responsibilities as Class Representatives, have no disabling conflicts of interest, and intend to vigilantly protect and advance the rights of the similarly situated Settlement Class. *See* Plaintiffs' Declaration, concurrently filed here within. Indeed, the Named Plaintiffs have litigated their respective cases for years. Plaintiffs have also chosen competent and experienced counsel, and multiple counsel, to pursue their claims. Thompson Decl., at ¶¶ 1-4, Ex. A. The Settlement Class will be more than adequately represented.

### E. Superiority

Rule 23(b)(3) requires that class litigation be the superior method for adjudicating these disputes. Factors considered include: class members' interest in individually controlling litigation; the extent of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing the class action. FED. R. CIV. PRO. 23(b)(3)(A)–(D). The superiority requirement tests whether "classwide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

This case involves approximately 8,408 Settlement Class Members, who have all been injured in, arguably, relatively small amounts. Additionally, given the risks associated with suing your employer and the confidential nature of the work involved, Settlement Class Members may not be willing to come forward to bring a claim. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30"). But, even if the individual Class Members were inclined to seek relief, such repetitious litigation would not benefit the Parties or the Court. *McCrary v. Elations Co., LLC*, No. EDCV 13-00242 JGB, 2014 WL 1779243, at *16 (C.D. Cal. Jan. 13, 2014) ("It is more efficient to resolve the common questions . . . in a [single] proceeding rather than to have individual courts separately hear these cases"). Therefore, Settlement of the instant case as a class action is superior to any alternative.

## VII.    THE COURT SHOULD PRELIMINARILY APPROVE THIS SETTLEMENT

### A.    The Proposed Settlement Meets the Standards for Preliminary Approval

"Preliminary approval of a proposed settlement is the first step in a two-step process required before a class action may be settled."  *Beck-Ellman v. Kaz USA, Inc.*, 2013 WL 1748729, 2013 WL 1748729 at *5 (S.D. Cal. Jan. 7, 2013).  First, the Court reviews the settlement preliminarily to determine whether it is sufficient to warrant public notice and a hearing.  *Manual for Complex Litigation* (2d ed.) § 21.632.  This initial assessment is generally made on the basis of information already known to the Court and, if necessary, may be supplemented by briefs, motions, or an informal presentation from the settling parties, if requested.  *Ogbuehi v. Comcast of California/Colorado/Florida/Oregon, Inc.*, No. 2:13–cv–00672, 2014 WL 4961109 at *9 (E.D. Cal. Oct 2, 2014).

The Court's scrutiny of the proposed settlement is as rigorous at preliminary approval as at the final approval stage. *See, e.g., Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036-37 (N.D. Cal. 2016). Recent changes to Rule 23(E)€ provides the Court with guidance on the factors to be considered, including whether the class has been adequately represented, whether the settlement was the product of arm's-length negotiations, the relief afforded to the class, the costs, risks, and delay of trial and appeal, the effectiveness of any proposed method of distributing relief to the class, the terms of any proposed award of attorney's fees (including the timing of the payment thereof), and whether the proposal treats class members equitably relative to each other.  FED. R. CIV. PRO. 23(e)(2).[8]

#### 1.    The Settlement was reached after Contentious and Informed Arms' Length Negotiations

"A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery." *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403 at *9 (C.D. Cal. June 10, 2005).  Moreover, if the terms of the settlement are fair, courts generally assume the negotiations were proper.  *See In re GM Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785-86 (3d Cir. 1995).

In the instant case, the Settlement was negotiated after disclosures and formal/informal

---

[8] The Named Plaintiffs will detail their request for attorneys' fees and costs in a separate motion. However, the Named Plaintiffs' attorneys' fees will represent a negative lodestar.

1   discovery in prior similar matters involving the same lawyers, and following initial disclosures here

2   of information which enabled Class Counsel to develop a damages model, which approximated the

3   value of the Settlement Class's claims. Thompson Decl., at ¶¶ 26-33, 111.  Additionally, the litigants

4   also engaged *multiple* experienced and respected mediators in an attempt to broker a settlement (at

5   least one of whom was demanded by counsel for the Intervenors).  The San Diego Action litigants

6   mediated their claims with Hon. Victor E. Bianchini, who is a respected neutral with significant

7   experience in class action and wage and hour claims.  *Id.*, at ¶ 38.[9]  The San Francisco Action was

8   mediated with the aid of the Ninth Circuit's ADR program.  *Id.*, at ¶ 21.  And, the litigants in both the

9   San Diego Action and the San Francisco Action collectively mediated their disputes with Mark S.

10  Rudy and Tripper Ortman.[10]  *Id.*, at ¶ 40-60.  Yet, even with the assistance of multiple neutral

11  mediators, the litigants' settlement negotiations extended over years and only concluded after both

12  direct negotiations, multiple mediations, and concessions on all sides.  The involvement of mediators,

13  the appeals involved, as well as the lengthy and adversarial nature of the settlement negotiations, are

14  all indicia of the "contentious" nature of the underlying negotiations. *See Wershba,* 91 Cal. App. 4th

15  at 245.

16          2.      The Proposed Settlement Falls Within the Range of Possible Approval

17          The monetary Settlement Consideration provides $4,500,000 in direct relief to the Settlement

18  Class, and no less than an additional $1,000,000 to Entertainers who continue to Perform at the Clubs

19  following conversion to employees and Final Approval; many of whom are Class Members.

20  Settlement Agreement, at ¶ 5.1.  Based on the total number of Settlement Class Members, and the total

21  number of shifts worked, Plaintiffs estimate the **average recovery will be $274.35**.  Thompson Decl.,

22  at ¶ 113.  Settlement Class Members will not have to take any affirmative steps to secure their

23  monetary portion of the Settlement. Instead, these funds will be mailed directly to the Settlement Class

24  Members, with any unclaimed funds to be held by the State of California's unclaimed property fund

25  in the Class Member's name.  Settlement Agreement, at ¶ 6.3.1.  Thus, this recovery is not

26

27          [9] Hon. Bianchini's qualifications can be found at https://www.judicatewest.com/adr/victor-bianchini, and Mr. Rudy's qualifications at https://rezlaw.com/mark-rudy/.

28          [10] Mr. Ortman's qualifications can be found at https://ortmanmediation.com/mediator-tripper-ortman/.

reversionary, illusory, or insignificant in any regard.

This Settlement also has to be placed in context.  Settlement Class Members only worked 56.25 days and earned over $40 on average per hour in Dance Fees paid to them *by the Clubs* (*excluding* tips).[11]  Thompson Decl., at ¶ 114.  Moreover, these dance fee payments were memorialized by the Clubs with the issuance of IRS Form 1099-MISC's each year during the Class Periods in the total yearly amounts paid; the existing case law favoring such payments, in these particular circumstances, as constituting "offsets" of minimum wage claims.    Thus, if this Court follows just decisions (one of which was issued by the California Court of Appeal), the result would be that the Court would find that most of dancers, most of the time, made far in excess of minimum wage; with the computer data also demonstrating that most Class Members worked very few overtime hours.  *Id.*, at ¶ 27.  Accordingly, the vast majority of the potential damages would be the result of civil penalties, waiting time penalties and premium wage for meal and rest breaks, which this Court, given the circumstances just referenced, could significantly reduce or negate altogether.  *Id.*, at ¶ 30.  Plaintiffs' damages model estimates Class Members received $96.96 dollars less ($5,454.16 divided by 56.25 shifts) than they should have been paid per shift worked (2.42 hours of paid at their average 40 dollar per hour rate).  *Id.*, at ¶ 33.

The valuation of the claims, and the ultimate Settlement, was informed by the litigants' early informal discovery prior to mediation and damages models presented at mediation.  The Named Plaintiffs projected that the total damages (excluding penalties) for the Settlement Class in that case could exceed $45.8 million, if Plaintiffs were successful at trial on all issues, including no wage offset allowed.  *Id.*, at ¶ 111.  Accordingly, the Settlement Fund (*including* the enhanced terms of employment) represents approximately 12.0% of the non-penalty total damages.  *Id.*, at ¶ 133.[12]  This is well within the bounds of reasonableness. *See Viceral v. Mistras Grp., Inc.* (N.D. Cal. Oct. 11, 2016,

---

[11] As will be discussed in greater detail in Defendants' submission, a sampling of their 2017 computer data established that the "average" dancer in the Class only worked 37.73 shifts *per year* at the Clubs (or 3.14 shifts per month), and 5.21 hours per shift,

[12] If the Settlement is evaluated based on the net amount received by the Class, it would still warrant approval.  The average monetary benefit that each Class Member receives will be approximately $274.35 ($2,306,750 net monetary settlement benefit/8,408 Class Members).  This represents approximately 5.0% of the average individual damages ($274.35 recovery/$5,454.16 individual damages).  The net recovery also represents approximately 5.0% of the total damages ($2,306,750 net monetary settlement benefit/$45,858,577.28).

No. 15-CV-02198) 2016 WL 5907869, at *3, 7 (approving a California wage and hour settlement where the class received 11.6% of the estimated total liability, or approximately $29 per work week); *Leverage v. Traeger Pellet Grills, LLC* (N.D. Cal. June 28, 2017, No. 16-CV-00784) 2017 WL 2797811, at *7 (approving a California wage and hour settlement where the class received 18% of the estimated total liability); *see also In re Newbridge Networks Sec. Litig.* (D.D.C. Oct. 23, 1998) 1998 WL 765724, at *2 ("Courts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; but an agreement that secures roughly six to twelve percent of a potential trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness."); *Strube v. Am. Equity Investment Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (approving a settlement equal to 2% of estimated potential recovery); *In re Toys R Us-Del., Inc.—Fair &amp; Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 453-54 (C.D. Cal. 2014) (granting final approval of a settlement providing for consideration equating to 3% of possible recovery); *Reed v. 1-800 Contacts, Inc.*, 2014 U.S. Dist. LEXIS 255, 2014 WL 29011, at *6 (S.D. Cal. Jan. 2, 2014) (granting final approval where settlement represented 1.7% of possible recovery (net settlement fund of $8,288,719.16, resolving claims worth potentially $499,420,000)); *In re Payment Card Interchange Fee &amp; Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 229 (E.D.N.Y. 2013) (granting final approval to class action settlement where the amount was about 2.5% of the highest damages estimate as "within the range of reasonableness in light of the best possible recovery and in light of all the attendant risks of litigation"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (holding that a "settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair.") (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1981) (internal quotation marks omitted); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery").[13]

---

[13] In exchange for this relief, the Settlement Class agrees to release claims that could have, or should have, been pled in the complaints. Accordingly, the scope of the release is also reasonable. *Vasquez v. Coast Valley Roofing, Inc.*, 670 F.Supp.2d 1114, 1126 (E.D. Cal. 2009) (finding a class

Notwithstanding the foregoing, courts are reluctant to compare settlements to a plaintiffs' "claims for damages"—which may be "exaggerated."—and instead analyze a settlement based on what the Plaintiffs might *actually recover*. *See Van Ba Ma v. Covidien Holding, Inc.*, No. SACV 12-2161) 2014 WL 2472316, at *3 (C.D. Cal. May 30, 2014) (stating that courts do not judge settlement amounts "against a hypothetical or speculative measure" but instead against "what the Plaintiffs were likely going to recover"); *Pigford v. Glickman,* 185 F.R.D. 82, 98, 102–103 (D.D.C. 1999) (collecting cases and holding that "[b]y far the most important factor [in approving a class settlement] is a comparison of the terms of the compromise or settlement with the *likely recovery* that Plaintiffs would realize if the case went to trial," which includes an assessment of the merits and strength of the Plaintiffs' claims and the possibility that some Plaintiffs "would have recovered nothing" because they "had little in the way of documentation or proof of their claims"); *In re Tableware Antitrust Litigation*, 484 F.Supp.2d 1078, 1080 (N.D. Cal. 2007) ("To evaluate adequacy, courts primarily consider Plaintiffs' *expected recovery* balanced against the value of the settlement offer.") (italics added).

The maximum theoretical recovery does not account for the strength of a plaintiff's claims, the likelihood that the defendant will prevail at trial, the court's duty to review an award for discretionary reductions, or the defendant's constitutional right not to pay excessive and arbitrary penalties, among other factors. Indeed, a plaintiff could dramatically increase his or her maximum theoretical recovery simply by citing additional Labor Code provisions in his or her complaint, regardless of whether those claims had any merit. That is why courts focus on *likely* recoveries instead of maximum theoretical recoveries. It is also why courts do not try to assess settlements with mathematical precision, but instead evaluate settlements *holistically*—"an amalgam of delicate balancing, gross approximations and rough justice." *In re Microsoft I-V Cases,* 135 Cal.App.4th 706, 723 (2006).

         a.        *The Risk of the Litigation Favors Settlement*

It can be difficult to ascertain with precision the likelihood of success at trial. "The Court cannot and need not determine the merits of the contested facts and legal issues at this stage, [Citation],

---

action settlement fair because the "settlement does not release unrelated claims that class members may have against defendants."). *Cf. Trotsky v. Los Angeles Federal Savings & Loan Ass'n.*, 48 Cal.App.3d 134, 147-49 (1975) ("[T]he complaint was not amended to encompass the terms of the settlement. Without amendment of the complaint the purported settlement… was outside the scope of the action and was not valid.").

23

1    and to the extent courts assess this factor, it is to 'determine whether the decision to settle is a good

2    value for a relatively weak case or a sell-out of an extraordinary strong case.'" *Misra v. Decision One*

3    *Mortg. Co.*, No. SACV070994, 2009 WL 4581276, at *7 (C.D. Cal. Apr. 13, 2009).

4            Plaintiffs are confident about the strength of their claims.  Nonetheless, they recognize that

5    Defendants have factual and legal defenses (none-the-least of which is the wage offset claim) that, if

6    successful, could potentially defeat or substantially reduce the value of Plaintiffs' lawsuits.  Thompson

7    Decl., at ¶ 34-37, 114-119.  For example, Plaintiffs could potentially be unable to certify a class (due

8    to, among other reasons, the arbitration agreements with comprehensive class and collective action

9    waivers) or prove the merits of their claims (on a class-wide basis) at trial. These risks are not remote

10   in an employment case; particularly one involving exotic dancers. *See, e.g., Nelson v. Texas Sugars,*

11   *Inc.* 2020 WL 7134143 (5th Cir. 2020) (affirming a jury verdict finding that exotic dancers were

12   independent contractors and not employees); *Buel v. Chowder House*, *Inc.* 2006 WL 1545860 (Cal.

13   App. 1 Dist. 2006) (*involving one of the very Defendants here*, the Court of Appeal affirmed a jury

14   verdict under California law that the dancer was not an employee and was properly classified as an

15   independent contractor); *State of Oregon v. Acropolis McLoughlin, Inc.,* 945 P.2d 647 (Or. App. 1997)

16   (finding exotic dancers to have been independent contractors and not employees in misclassification

17   case after business modifications); *Matson v. 7455, Inc.,* 2000 WL 1132110 (D. Or. 2000) (granting

18   defendant nightclub's motion for summary judgment on exotic dancer misclassification claim and

19   noting that because the dancer kept more in dance fees than the applicable wage rate, she would be

20   entitled to nothing even if she had been misclassified; "[n]o limitation in the F.L.S.A. statute exists

21   precluding the use of such fixed fees in calculation of an employee's minimum wage"); *Labriola v.*

22   *Clinton Entertainment Management, LLC*, 2017 WL 1150989 at **11-16 (N.D. Ill. March 28, 2017)

23   (permitting a wage offset for "1099" payments related to "fixed dance fees" in an exotic dancer

24   misclassification case); *Ruffin v. Entertainment of the Eastern Panhandle*, 845 F.Supp.2d 762 (N.D

25   W.Va. 2012) (recognizing the ability for a club to obtain a dance fee offset); *Moody v. Razooly,* 2003

26   WL 464076 at *7 (Cal. Ct. App. Feb. 25, 2003) (allowing wage offset, with the Court of Appeal noting

27   that to *not* credit the "special dance fees" against wages would result in a "windfall" for the plaintiffs).

28   *See also Zackaria v. Wal-Mart Stores, Inc.*, No. ED CV 12–1520, 2015 WL 2412103, at *16 (C.D.

1   Cal. May 18, 2015) (denying certification of claims that asset protection coordinators were

2   misclassified as exempt; although putative class members received similar training and were held to

3   identical job expectations, an analysis of how employees actually spent their time is an individual

4   question not amenable to resolution through collective proof).  See also *Acropolis McLoughlin,* 945

5   P.2d at 192 (". . .the economic reality with regard to each dancer necessarily depends on the

6   circumstances of the individual dancer, evidence that is not in the record").

7          While the San Diego Action was clearly predicated upon the issuance of the *Dynamex* decision,

8   that ruling does not guarantee that the Plaintiffs will prevail here. First, *Dynamex*, obviously, has no

9   relevance to the adjudication of worker classification under the FLSA. Second, defense counsel has

10  identified to Plaintiffs' counsel a variety of the defenses they would intend to invoke both with regard

11  to the *Dynamex* ruling itself and its application to the particular circumstances here; none-the-least

12  being Defendants' contention that in the unique circumstances here, given the *Chowder House*

13  decision discussed above finding an exotic dancer who had performed at one of the very defendant

14  Clubs subject to this Settlement to have been an independent contractor under California law, applying

15  dynamics retroactively to the class periods at issue here would violate federal due process.  Again,

16  *Dynamex* does not guarantee a favorable misclassification ruling for the Plaintiffs.  And, third, as

17  discussed above, even upon a finding of misclassification, that does not mean, because of the wage

18  offset issue, that the Plaintiffs would recover any back wages or overtime pay.  The wage offset

19  defense could, frankly, negate any recovery. In fact, the Eastern District of Michigan recognized the

20  viability of a wage setoff counterclaim in the 2008 case of *Doe v. Cin Lan, Inc.,* (related to and a

21  precursory of the Michigan Action), finding:

22          As stated above, Cin-Lan's claim is for return of a portion of the dance fees it allowed
            Doe to keep. Cin-Lan has alleged facts sufficient to show that in the event Doe is
23          entitled to a minimum wage as an employee, Cin-Lan may be entitled to a return of its
            dance fees.
24

25  2010 WL 726710 at *6 (Aug. 18, 2009 E.D. Mi.).

26         It is also worth noting that many, if not all, of the Class Members elected to Perform as

    independent contractors, and not as employees, when given the option.  Thompson Decl., at ¶ 16.
27
    Accordingly, there are potential issues of estoppel, *in pari delicto*, and other equitable considerations
28
    that may be asserted, in addition to wage off-set, which could negate or substantially reduce any

                                                       25

1    recovery by the Plaintiffs. *See also Chowder House*, 2006 WL 1545860 at **9-10 (voluntarily

2    choosing to work as an independent contractor weighs in favor of independent contractor status).

3           Defendants have also argued in negotiations that: (1) Class Members' income while working

4    at the Clubs well exceeded any minimum wages, and, hence, any recovery would create a "windfall"

5    for the dancers; (2) Defendants did not engage in unlawful tip sharing in regard to the monies paid to

6    dancers; (3) that many dancers may not have standing to pursue their wage claims and/or may have

7    difficulty in proving their damages because they never filed tax returns and therefore neither reported

8    their tip income nor paid taxes on the significant income they earned; (4) Plaintiffs cannot prove their

9    joint employer allegations; (5) certain Defendants lack the resources to sustain any judgment; (6) class

10   certification would be difficult if not impossible to obtain for the litigation class alleged; (7) the text

11   of the PAGA statute is unclear as to whether PAGA penalties may be "stacked" -- *see e.g.*, *Urbino v.*

12   *Orkin Svcs. of Calif., Inc.* (9th Cir. 2013) 726 F.3d 1118, 1121–1123 (holding that the claims of all

13   "aggrieved employees" cannot be aggregated to establish the $75,000 threshold for diversity

14   jurisdiction because aggrieved employees do not have a "common and undivided interest" in those

15   penalties); (8) recovery of the full "stacked" amount of PAGA penalties is highly unlikely because of

16   the facts of the case and as a result of the trial court's discretion to reduce PAGA penalties on grounds

17   that to do otherwise would be "unjust," "oppressive," or "confiscatory" *see* Lab. Code, § 2699, subd.

18   (e)(2); (9) Plaintiffs cannot obtain the higher penalty for each aggrieved employee per pay period for

19   each "subsequent" violation -- *see Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1209

20   ("Until the employer has been notified that it is violating a Labor Code provision (whether or not the

21   Commissioner or court chooses to impose penalties), the employer cannot be presumed to be aware

22   that its continuing underpayment of employees is a 'violation' subject to penalties."); (10) Plaintiffs'

23   meal and rest-break claims have negligible value because Defendants' evidence shows that aggrieved

24   employees exercised complete autonomy over when or whether to take a meal and/or rest break and

25   that Defendants' computer records establish that neither meal nor rest breaks were legally required in

26   most of the circumstances here; (11) Labor Code sections 201 through 203 penalties cannot be

27   assessed because there is no evidence that Defendants acted willfully -- *see Harris v. Vector*

28   *Marketing Corp.* (N.D. Cal. 2009) 656 F.Supp.2d 1128, 1146–1147 (dismissing claim for section 203,

subdivision (a) penalties because "there is no evidence that (defendant) willfully failed to pay Ms. Harris wages in a timely manner"); (12) even if Plaintiffs could prove that the information provided by Defendants did not strictly comply with section 226, subdivision (a), any penalties could be reduced in light of Defendants' good-faith belief that they were providing compensation information to *independent contractors*, and not to employees; and (13) even if Plaintiffs could prove willful misclassification here, they face substantial risk that the total penalty is limited to $25,000 (or $15,000 if they cannot show that Defendants engaged in a "pattern or practice" of such violations). *See* Lab. Code, § 226.8, subd. (a)(1)).

In addition, while Plaintiffs have alleged significant exposure for the Defendants under PAGA, the Defendants have, however, argued that claims under PAGA are subject to individualized arbitration and, not insignificantly for purposes of considering the reasonableness of this Settlement, the United States Supreme Court recently granted certiorari in *Viking River Cruises, Inc. v. Moriana* to answer the question of whether the Federal Arbitration Act (FAA) preempts a California Supreme Court ruling that arbitration agreements waiving the right to bring representative actions under PAGA were unenforceable under state law.[14]   If the Supreme Court rules that PAGA claims may be compelled to individual arbitration, that would *drastically* impact the Class Members' individual ability to recover under PAGA.

In short, this is highly contested litigation with significant risks for both sides, making settlement before trial appropriate.  "The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after several years of litigation." *In re Nvidia Derivs. Litig.*, No. C-06-06110, 2008 WL 5382544, at *3. (N.D. Cal. Dec. 22, 2008). Indeed, potential appeals aside, litigating a complex case through trial is inherently perilous regardless of the strengths or merits of the claims:

> [N]othing is assured when litigating against commercial giants with vast litigative resources, particular in such complex litigation as this, which would strain the cognitive capacities of any jury. Defense judgments were hardly beyond the realm of possibility. Accordingly, this factor weighs in favor of preliminary approval.

*Rebney v. Wells Fargo Bank,* 220 Cal. App. 3d 1117, 1140 (1990), *opinion modified* (June 18, 1990).

---

[14] https://www.supremecourt.gov/docket/docketfiles/html/public/20-1573.html

Finally, even if Plaintiffs were successful at trial, business realities have created uncertainty in Plaintiffs' ability to recover a hard-fought judgment. Potential exposure for the Settlement Class's claims, with labor code violations and PAGA penalties (unreduced) could exceed $45.8 million. Thompson Decl., at ¶ 111. Thus, Plaintiffs were concerned about Defendants' ability to absorb a large judgment in this case. *Id.*; *In re Toys R Us*, 295 F.R.D. 438, 452 (C.D. Cal. 2014) ("For its part, Toys risked the possibility of 'catastrophic damages' … The fact that both sides faced this type of all-or-nothing prospect weighs in favor of approval."); *County of Suffolk v. Long Island Lighting Co*. 907 F.2d 1295, 1323–1324 (2d Cir. 1990) (The Court should consider the ability of the defendant to withstand a greater judgment when approving a class settlement.).[15] These concerns are all-the-more acute giving the financial impact to the Clubs resulting from the conversion of Entertainers to employees and continuing nature of the global pandemic, which have led to the *permanent closure* of the following five Club Defendants: Chowder House Inc.; Deja Vu Showgirls of San Francisco, LLC; San Francisco – Roaring 20's, LLC; Cathay Entertainment, LLC; and EF5 Acquisitions Group, LLC (having also filed for bankruptcy). Thompson Decl., at ¶ 111. Prior to the submission of the Settlement to this Court for preliminary approval, Plaintiffs' counsel requested to review, subject to the protective order previously entered in the San Francisco Action, and defense counsel permitted the review of, summary financial information showing the dire economic circumstances that both the conversion of the entertainers to employees, in the pandemic, have wrought on the defendant Clubs (some of this information having been previously provided to Plaintiffs' counsel within the privilege and confidentiality confines of mediation). Accordingly, were this case to move forward, the ultimate recovery from Defendants could be problematic.

### b. Complexity, Expense, and Likely Duration of Further Litigation

Continuing to litigate these Actions would require continued and extensive resources coupled with significant Court time to proceed through trial and post-trial motions; which can often take years. Thompson Decl., at ¶¶ 109-110. Furthermore, wage and hour litigation is complex and expensive, as

---

[15] Indeed, the same liquidity issues that inform the Settlement's installment payment terms were also factors Plaintiffs weighed in deciding to settle this case. Thompson Decl., at ¶ 75. Further information regarding the financial position of Defendants may be addressed in Defendants' filings concurrently filed herewith.

1    it often necessitates extensive expert testimony, particularly with regards to damages (and, here, the

2    payment of taxes as well). *Id.* But even if Plaintiffs are successful at trial, they are acutely aware that

3    a judgment does not end the litigation. Plaintiffs fully expect that Defendants would appeal any

4    favorable judgment. *Id.* "Avoiding such a trial and the subsequent appeals in this complex case

5    strongly militates in favor of settlement rather than further protracted and uncertain litigation." *Nat'l*

6    *Rural Telecomms. Coop v. DirecTV*, 221 F.R.D. 523, 527 (C.D. Cal. 2004). Thus, "unless the

7    settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive

8    litigation with uncertain results." *Id.* at 526.

9         All the above is dwarfed by the realities of the COVID pandemic. Consider the potential for

10   more Clubs to go out of business and the Settlement becomes undeniably the favored result. The value

11   of an immediate recovery here outweighs the mere possibility of future relief after protracted and

12   expensive litigation. This concern is particularly acute in a case such as this where the Class Members,

13   by general nature, are more transient and difficult to find to secure testimony and evidence, and to

14   deliver benefits to, as time goes by. As a result, any additional and unnecessary delays frustrate the

15   Class Members' ability to enjoy the benefits of the relief provided under the Settlement.

16                    *c.     The Experience and Views of Counsel*

17        In contemplating the preliminary approval of a proposed settlement, "[t]he recommendations

18   of plaintiffs' counsel should be given a presumption of reasonableness." *Knight v. Red Door Salons*

19   *Inc.* (N.D. Cal. Feb. 2, 2009, No. 08-01520) 2009 WL 248367, at *4 (*citing Boyd v. Bechtel Corp*.

20   (N.D. Cal. 1979) 485 F.Supp. 610, 622); *see also Nat'l Rural Telecomms. Coop*., 221 F.R.D. at 528

21   (*citing Cotton v. Hinton* (5th Cir. 1977) 559 F.2d 1326, 1330). "Parties represented by competent

22   counsel are better positioned than courts to produce a settlement that fairly reflects each party's

23   expected outcome in litigation." *In re Pacific Enters. Secs. Litig*., 47 F.3d at 378. Thus, "the Court

24   should not without good cause substitute its judgment for [counsel's]." *Boyd*, 485 F. Supp. at 622.

25        Nothing suggests that Class Counsel's recommendation of this Settlement is unreasonable.

26   Named Plaintiffs and the Settlement Class were represented by law firms having extensive class action

27   experience, including wage and hour litigation. Thompson Decl., at ¶ 1-4, Ex. A; *Knight*, 2009 WL

28   248367, at *4 ("In addition to being familiar with the present dispute, Plaintiffs' counsel has

1   considerable expertise in employment, consumer and class action litigation."). Moreover, Class

2   Counsel's analysis was based on early investigation and discovery which allowed Plaintiffs to

3   determine the potential liabilities in these cases. Thompson Decl., at ¶¶ 26-37.

4           3.      The Settlement Provides an Effective Method of Distributing Relief to the
                    Class
5

6           The Settlement does not improperly discriminate between any segments of the Settlement

7   Class. *Vasquez,* 670 F.Supp.2d at 1125. Each Settlement Class Member is entitled to the same relief

8   calculated from the same formula. Indeed, the only variation between the Settlement Class Members'

9   recovery is a function of the amount of their 1099 payments during the Class Periods. Given that both

10  the civil penalties and damages accrued by Settlement Class Members would be logically proportional

11  to the amount of time worked, the payment formula articulated in the Settlement Agreement is both

12  rationally based and directly related to the claims asserted. *See True v. American Honda Motor Co.,*

13  749 F.Supp.2d 1052, 1067 (C.D. Cal. 2010) ("[D]ifferential treatment of class members may be

14  appropriate where 'the settlement terms are rationally based on legitimate considerations.'");

15  *Petruzzi's, Inc. v. Darling–Delaware Co., Inc.,* 880 F.Supp. 292, 300–01 (M.D. Pa. 1995) ("disparate

16  treatment of class members may be justified by a demonstration that the favored class members have

17  different claims or greater damages"). Additionally, a check will be directly provided to each

18  Settlement Class Member receiving a Cash Payment and any uncashed checks will be held in the

19  State's Unclaimed Property Fund; no claims process being necessary. This will ensure that each

20  Settlement Class Member receives the benefit of the Settlement.

21          Additionally, while the Settlement Agreement allows Class Representatives to seek an

22  Enhancement Award of between $3,000 and $5,000 each, this payment is a sensible amount given the

23  amount of time expended in prosecuting this case and the nature of the releases obtained. *Roe v. Frito-*

24  *Lay, Inc.,* No. 14-CV-00751, 2017 WL 1315626, at *8 (N.D. Cal. Apr. 7, 2017) ("[A] $5,000 incentive

25  award is 'presumptively reasonable' in the Ninth Circuit.") (collecting cases). Indeed, Plaintiffs would

26  have been unable to properly value the Settlement Class's claims without the input of the Class

27  Representatives. Thompson Decl., at ¶¶ 103.

28          Here, the Settlement was a product of extensive and arm's length negotiations, and involved

    counsel experienced in class litigation. It provides the Settlement Class real and immediate relief. It

                                                    30

1   is for these reasons that Plaintiffs request that the Settlement be preliminarily approved.

2   **VIII.   THE SETTLEMENT ALSO WARRANTS APPROVAL UNDER THE FLSA**

3        In addition to the standards set forth in Rule 3.769, the FLSA contains a separate standard for

4   examining settlements.  The FLSA was enacted for the purpose of protecting all covered workers from

5   the inequities in the workplace that result from the differences in bargaining power between employers

6   and employees. *See Barrentine v. Arkansas–Best Freight System, Inc*., 450 U.S. 728, 739 (1981). The

7   goal of the FLSA was to ensure that each employee covered by the Act received "[a] fair day's pay

8   for a fair day's work and would be protected from the evil of overwork as well as underpay." *Id.* at

9   739 (internal citation and quotations omitted). The FLSA, therefore, provides that "[a]ny employer

10  who violates the provisions of section 206 or 207 of this title shall be liable to the employee … affected

11  in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case

12  may be...."  29 U.S.C. § 216(b).  The FLSA's provisions are mandatory and, except in two narrow

13  circumstances, are generally not subject to bargaining, waiver, or modification by contract or

14  settlement. *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697 (1945).  The two circumstances in which the

15  FLSA may be compromised are claims that are supervised by the Secretary of Labor and when a court

16  reviews and approves a settlement in a private action for back wages under 29 U.S.C. § 216(b).  *Lynn's*

17  *Food Stores, Inc. v. United States,* 679 F.2d 1350, 1353 (11th Cir. 1982).

18       The latter exception applies to this case.  The Court's role in this situation is comparable to

19  that of a court in a settlement of a class action. *Collins v. Sanderson Farms, Inc*., 568 F. Supp. 2d 714,

20  719 (E.D. La. 2008) (comparing FLSA settlements to Rule 23(e) settlements).  "In essence, the Court

21  must ensure that the parties are not, via settlement of the plaintiffs' claims, negotiating around the

22  clear FLSA requirements of compensation for all hours worked, minimum wages, maximum hours,

23  and overtime." *Collins, supra,* 568 F. Supp. 2d at 719. *citing* 29 U.S.C. §§ 206, 207.  The existence

24  of a question as to the plaintiffs' entitlement to compensation under the FLSA serves as a guarantee

25  that the parties have not manipulated the settlement process to permit the employer to avoid its

26  obligations under the FLSA.  Thus, to ensure that plaintiffs did not abandon their rights under the Act,

27  "the court must determine whether such a question, or *bona fide* dispute, exists."  *Crawford v.*

28  *Lexington–Fayette Urban County Gov't*, No. 06-299, 2008 WL 4724499, *3 (E.D. Ky. Oct. 23, 2008).

The Settlement Agreement in this case resolves "*bona fide* disputes" under the FLSA and contains terms that seek to avoid further actions under the FLSA and other state wage and hour laws. Both sides aggressively advocated their positions, which clearly demonstrated that the legal and factual issues presented in these Actions did not necessarily favor either side. These *bona fide* disputes justify settlement in this matter. Moreover, for all the foregoing reasons discussed in the context of Rule 23 standards, the Settlement is a fair and reasonable compromise and should be approved under the appropriate FLSA standards.

## IX. THE PROPOSED NOTICE WILL ADEQUATELY APPRISE THE CLASS OF THEIR RIGHTS UNDER THE SETTLEMENT

Assuming the Court determines the Settlement is fair and adequate, it should also order that notice be sent to the Class. Manual for Complex Litig., § 21.632 at 321. Pursuant to Rule 23(c)(2):

> the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means.The notice must clearly and concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

The proposed Notice meets all of these requirements. The Class Notice is neutral, written in an easy-to-understand language, and provides entertainers with: (1) basic information about the Actions; (2) a description of the benefits provided; (3) an explanation of how Class Members can exercise their right to object or opt-out; (4) an explanation that any claims against Defendants that could have been litigated in these Actions will be released; (5) a schedule of the names of counsel for the Class and information concerning attorneys' fees and incentive awards; and (6) the date and time of the Fairness Hearing, along with an explanation of eligibility to appear. Settlement Agreement, Ex. D.

The distribution of the Notice will be provided directly by mail (and email where available), through the clubs themselves (in the dressing rooms), through an industry advocacy group

1   (International Entertainment Adult Union), through an industry website commonly used by Class

2   Members (StripperWeb.com), and through social media.  Reminder notices will also be provided.

3   Collectively, this direct and publication notice regime is predicted to directly reach a vast majority of

4   the Class and, as noted, addresses the concerns raised by the Ninth Circuit regarding the adequacy of

5   the notice process in the first settlement in the San Francisco Action.  This process will ensure that the

6   Class receives the best practicable notice that is "reasonably calculated, under all the circumstances,

7   to apprise interested parties of the pendency of the action and afford them an opportunity to present

8   their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314(1950).

9   **X.** **CONCLUSION**

10        For the reasons stated above, Plaintiffs respectfully request that the Court grant their request

11   for leave to file their respective Second Amended Complaints, certify the Settlement Class, appoint

12   Jane Roes 1 and 2 from the San Diego Action and Jane Roes 1 and 3 of the San Francisco Action as

13   Class Representatives and the undersigned counsel as Class Counsel, designate the Settlement

14   Administrator, approve the proposed Class Notice, and preliminarily approve the Settlement.

16   Date: February 11, 2022                    SOMMERS SCHWARTZ P.C.

18                                              By: /s/ Trenton Kashima
                                                Trenton R. Kashima, Esq.
19                                              402 West Broadway, Suite 1760
                                                San Diego, CA 92101
20                                              Telephone:  (619) 762-2125
                                                Facsimile:   (619) 762-2127

22                                              *Attorneys for Plaintiff and the*
                                                *Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND LEAVE TO FILE AMENDED COMPLAINT, AND PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND LEAVE TO FILE AMENDED COMPLAINT** was served by electronically filing through the Court's CMECF system on February 11, 2022 which will send notification to counsel of record.

*/s/ Trenton R. Kashima*
Trenton R. Kashima